# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

NATHANAEL ROMANCHUK,
KATIE KUCZKOWSKI, and TERA
CASTILLO, on behalf of themselves
and all others similarly situated,

Hon.
Case No.

*Plaintiffs*,

v.

FCA US LLC,

*Defendant*.

## CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Douglas L. Toering (P34329)
dtoering@manteselaw.com
Kenneth R. Chadwell (P39121)
kchadwell@manteselaw.com
**MANTESE HONIGMAN, PC**
1361 E. Big Beaver Rd.
Troy, MI 48083

Timothy N. Mathews
Alex M. Kashurba
**CHIMICLES SCHWARTZ KRINER & DONALDSON SMITH LLP**
361 W. Lancaster Avenue
Haverford, Pennsylvania 19041

**CAPSTONE LAW APC**
Steven R. Weinmann
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi
1875 Century Park East, Suite 1000
Los Angeles, CA 90067

**BERGER MONTAGUE PC**
Russell D. Paul
Jeffrey L. Osterwise
Amey J. Park
Abigail J. Gertner
1818 Market Street
Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Putative Class Members*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION------------------------------------------------------------------ 1

JURISDICTION AND VENUE------------------------------------------------- 3

PARTIES --------------------------------------------------------------------------- 4

      Plaintiff Nathanael Romanchuk (Florida) ----------------------------------- 4

      Plaintiff Katie Kuczkowski (Ohio) -------------------------------------------- 6

      Plaintiff Tera Castillo (Wisconsin) ------------------------------------------- 8

      Defendant -------------------------------------------------------------------------- 10

FACTUAL ALLEGATIONS------------------------------------------------------ 10

A.    The Oil Consumption Defect------------------------------------------------- 10

B.    FCA's Knowledge of the Defect--------------------------------------------- 14

TOLLING OF STATUTES OF LIMITATIONS ------------------------------ 37

CLASS ACTION ALLEGATIONS -------------------------------------------- 38

CLAIMS FOR RELIEF ----------------------------------------------------------- 42

COUNT I
Violations of Florida's Deceptive and Unfair Trade Practices Act
FLA. STAT. § 501.201, et seq. ("FDUTPA")
Plaintiff Romanchuk Individually, and on Behalf of the Florida Subclass --------- 42

COUNT II
Violations of the Ohio Consumer Sales Practices Act
OHIO REV. CODE ANN. §§ 1345.01, et seq. ("OCSPA")
Plaintiff Kuczkowski Individually, and Behalf of the Ohio Subclass -------------- 45

COUNT III
Violations of the Wisconsin Deceptive Trade Practices Act

i

Wis. Stat. §§ 100.18, et seq. ("WDPTA")
Plaintiff Castillo Individually, and on Behalf of the Wisconsin Subclass ---------- 48

COUNT IV
Breach of Express Warranty
Plaintiffs, Individually and on Behalf of the State Subclasses ---------------------- 51

COUNT V
Breach of the Implied Warranty of Merchantability
Plaintiffs, Individually and on Behalf of the State Subclasses ---------------------- 53

COUNT VI
Violations of the Magnuson–Moss Warranty Act ("MMWA")
15 U.S.C. §§ 2301–2312
All Plaintiffs, Individually and on Behalf of the Nationwide Class ---------------- 55

COUNT VII
Fraudulent Concealment
All Plaintiffs, Individually and on Behalf of the State Subclasses ------------------ 58

COUNT VIII
Unjust Enrichment
In the Alternative to All Other Claims
All Plaintiffs, Individually and On Behalf the State Subclasses -------------------- 60

PRAYER FOR RELIEF ------------------------------------------------------------------- 61

JURY DEMAND ------------------------------------------------------------------------- 62

Plaintiffs Nathanael Romanchuk, Katie Kuczkowski, and Tera Castillo ("Plaintiffs") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendant FCA US LLC ("FCA").

## INTRODUCTION

1.      This is a class action brought against FCA by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of 2014-2020 Jeep Cherokees, 2015-2020 Jeep Renegades, 2017-2020 Jeep Compasses, 2013-2016 Dodge Darts, 2015-2020 Ram ProMaster City's, 2015-2016 Chrysler 200's, and 2016-2020 Fiat 500X's (the "Class Vehicles").  Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles.

2.      The Class Vehicles are all equipped with a 2.4L Tigershark multiair four-cylinder engine.  These engines suffer from a defect that causes them to burn or consume excessive amounts of engine oil (the "Oil Consumption Defect" or "Defect").

3.      As a result of the Defect, the Class Vehicles stall unexpectedly and without warning, often when turning at an intersection or when accelerating or decelerating, creating a serious safety hazard.

4.      The Defect can also result in engine damage and premature wear that necessitates costly repairs, including engine replacements.

1

5.     Owners and lessees are also forced to incur considerable expense and burden in continually having to add oil to their vehicles.

6.     Because the Oil Consumption Defect makes Class Vehicles unreliable and can render them inoperable, it affects their central functionality.

7.     FCA is aware of the Oil Consumption Defect but has refused to provide adequate repairs to eliminate it under warranty, and has continually sold the Class Vehicles without disclosing this known defect to purchasers.

8.     FCA has been aware of the defect since at least 2013, as evidenced by, *inter alia*, large numbers of consumers who have complained about this Defect dating back to at least 2013, including when consumers brought their Class Vehicles to FCA's authorized dealers for repairs.

9.     FCA's policy, as communicated to consumers who complain, is that it is acceptable for brand new Class Vehicles to burn 1 quart of oil every 1,000 miles. Upon information and belief, the Tigershark engine holds 5.5 quarts of oil, and under ordinary driving conditions the oil does not need to be changed for more than 5,500 miles.  This means that under FCA's oil burning policy it is acceptable to burn *all* the oil in the engine before it is necessary to perform an oil change.

10.     In most instances, FCA has refused to perform any repair, instead telling consumers that it is acceptable to burn 1 quart for every 1,000 miles and advising them to add additional oil between oil changes.  In rare circumstances FCA

will provide a full engine replacement but upon information and belief the replacement engines suffer the same defect.

11.     Despite FCA's knowledge of the Defect, which renders the Class Vehicles hazardous and unsuitable for their intended purpose, it has failed to provide adequate repairs and has also failed to disclose the Defect to unsuspecting consumers.

12.     Due to the undisclosed Oil Consumption Defect, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their FCA vehicles.  These customers continue to have to live with the risks of their vehicles stalling in the middle of traffic, potential engine damage, higher than expected maintenance costs, and diminution of value of their vehicles.  Plaintiffs accordingly seek relief both for themselves and for other owners or lessees of these Class Vehicles.

## **JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This

Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because FCA is headquartered in the Eastern District of Michigan and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, FCA advertises in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

15.    This Court has personal jurisdiction over FCA because it maintains its principal place of business in the Eastern District of Michigan, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Michigan and throughout the United States.

## PARTIES

### Nathanael Romanchuk (Florida)

16.    Plaintiff Nathanael Romanchuk is a citizen and resident of Florida.

17.    On or around December 15, 2018, Mr. Romanchuk purchased a new 2019 Jeep Renegade from Phillips Chrysler Jeep Dodge Ram, which is an authorized

FCA dealership in Ocala, Florida. Prior to his purchase, Mr. Romanchuk viewed information about the vehicle on Jeep's website, spoke with his dealer about the vehicle, test drove the vehicle, and reviewed the window sticker. Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the oil consumption defect had been disclosed.

18.     Mr. Romanchuk purchased his vehicle for personal, family, or household use. Mr. Romanchuk always has attempted to use his Class Vehicle in the normal and expected manner.

19.     On or around February 1, 2019, Mr. Romanchuk's vehicle stalled out while his wife was driving it. Shortly thereafter, he presented his vehicle to the dealership and they discovered his oil pan was completely empty. His vehicle had 3,000 miles at this time and no dashboard notification had alerted him that the oil was low.

20.     The dealership had him return after 1,500 miles in order to perform an oil consumption test.  When he returned, the dealership personnel said that some oil consumption was normal.  Nevertheless, they told Mr. Romanchuk that he would need to change his oil every 4,000 miles and check his dipstick whenever refilling his gas tank. Absent the Oil Consumption Defect, Mr. Romanchuk would need to change his oil far less frequently.

21.     Mr. Romanchuk continued to complain about the oil consumption issue during his subsequent oil changes but did not receive any additional repair or assistance for his vehicle. During this time, his car stalled again when his vehicle's odometer was around 12,000 miles.

22.     Out of fear that his vehicle would stall again, Mr. Romanchuk ended up trading his vehicle in for a 2020 Jeep Renegade, which he believed would not suffer the same Defect. However, since purchasing his new vehicle, it has begun to show early signs of excessive oil consumption.

23.     Had FCA disclosed the Defect, Mr. Romanchuk would not have purchased either Class Vehicle or would have paid significantly less for them.

24.     Additionally, as a result of the Defect, Mr. Romanchuk has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. Both vehicles have also suffered diminution in value due to the Defect and the resulting loss in both Jeep vehicles' resale value.

**Plaintiff Katie Kuczkowski (Ohio)**

25.     Plaintiff Katie Kuczkowski is a citizen and resident of Ohio.

26.     On or around February 25, 2018, Ms. Kuczkowski leased a new 2018 Jeep Compass from Medina Auto Mall which is an authorized FCA dealership in Medina, Ohio. Prior to her lease, Ms. Kuczkowski viewed information about the vehicle on Jeep's website, spoke with her dealer about the vehicle, test drove the

vehicle, and reviewed the window sticker.  Safety and reliability were important factors in her decision, and she would not have leased the vehicle if the Oil Consumption Defect had been disclosed.

27.    Ms. Kuczkowski leased her vehicle for personal, family, or household use. Ms. Kuczkowski at all times has attempted to use her Class Vehicle in the normal and expected manner.

28.    On or around February 6, 2020, Ms. Kuczkowski 's vehicle stalled out while driving in the middle of a busy intersection.  Shortly thereafter, she presented her vehicle to the dealership and they discovered her oil was two quarts low.  Her vehicle had approximately 25,000 miles at the time and no dashboard notification had alerted her that her oil was low.

29.    The dealership had her return after 1,000 miles in order to perform an oil consumption test.  When she returned, the dealership personnel said that some oil consumption was normal.  Nevertheless, they told Ms. Kuczkowski that she would need to change her oil every 4,000 miles and check her dipstick whenever refilling her gas tank.

30.    Ms. Kuczkowski has continued to complain about the oil consumption problems during her subsequent oil changes but has received no additional repair or assistance.

31.    Ms. Kuczkowski fears her vehicle will stall again and continues to endure the expense and inconvenience more frequent than expected oil changes.

32.    Had FCA disclosed the Defect, Ms. Kuczkowski would not have leased her Class Vehicle or would have paid significantly less for it.

33.    Additionally, as a result of the Defect, Ms. Kuczkowski has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. Her vehicle has also suffered diminution in value due to the Defect and the resulting loss in her Jeep vehicle's value.

**Plaintiff Tera Castillo (Wisconsin)**

34.    Plaintiff Tera Castillo is a citizen and resident of Wisconsin.

35.    On or around August 12, 2019, Ms. Castillo purchased a new 2018 Jeep Compass from Sheboygan Jeep Chrysler which is an authorized FCA dealership in Sheboygan, WI. Prior to her purchase, Ms. Castillo spoke with her dealer about the vehicle and reviewed the window sticker. Safety and reliability were important factors in her decision, and she would not have purchased the vehicle if the Oil Consumption Defect had been disclosed.

36.    Ms. Castillo purchased her vehicle for personal, family, or household use. Ms. Castillo at all times has attempted to use her Class Vehicle in the normal and expected manner.

8

37.    On or around April 10, 2020, Ms. Castillo's vehicle stalled out while driving around a corner. Then on April 14, 2020, her vehicle stalled out again, but this time while driving 35 mph on a roadway.  Shortly thereafter, she contacted the dealership and she stated her vehicle still had 2,500 miles before her next oil change and there was no low oil warning light on her dashboard when stalling incident occurred. She set up an appointment to have the car checked the next day at the dealership. In the meantime, she had someone check her oil and discovered that the oil pan was completely empty.

38.    At the appointment, the dealership inspected her vehicle and then advised that she would need to bring in her vehicle every 500 miles for at least the next 2,500 miles as part of an oil consumption test. The results of the test would determine if her engine needed to be replaced. Absent the Oil Consumption Defect, Ms. Castillo would need to change her oil far less frequently.

39.    Ms. Castillo has continued to complain about the oil consumption issue during her subsequent oil changes but has received no additional repair or assistance.

40.    Ms. Castillo fears her vehicle will stall again and continues to endure the expense and inconvenience more frequent than expected oil changes.

41.    Had FCA disclosed the Defect, Ms. Castillo would not have purchased her Class Vehicle or would have paid significantly less for it.

42.   Additionally, as a result of the Defect, Ms. Castillo has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. Her vehicle has also suffered diminution in value due to the Defect and the resulting loss in her Jeep vehicle's resale value.

## Defendant

43.   FCA US LLC ("FCA") is a Delaware Limited Liability Company headquartered in Auburn Hills, Michigan.

44.   FCA is engaged in the business of designing, manufacturing, warranting, marketing, advertising and selling vehicles, including the Class Vehicles, under the "Chrysler", "Jeep", "Dodge", "RAM", and "Fiat" brand names through a network of more than 2,000 dealerships in the United States.

45.   The design, manufacture, distribution, service, repair, modification, installation and decisions regarding the engines and other components within the Class Vehicles were controlled exclusively by FCA and its agents and affiliates.

## FACTUAL ALLEGATIONS

### A.    The Oil Consumption Defect

46.   The purpose of engine oil is to provide lubrication in order to reduce friction and wear on moving parts of a vehicle's engine.  Although it is necessary to change the oil in a vehicle periodically as the oil gets dirty and thick over time, a

properly functioning engine should not typically burn or consume significant amounts of engine oil.

47. If there is insufficient oil, the engine will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure. Insufficient oil can also result in engine stalling while the vehicle is in use.

48. Moreover, when an engine burns oil, the engine will run rough (because oil does not fully combust in the cylinders), and spark plugs will become fouled, which can cause further problems in other engine components.

49. The Class Vehicles Class are all equipped with a 2.4L Tigershark multiair four-cylinder engine. These engines suffer from a Defect that results in excessive consumption of engine oil under ordinary use. A very large number of drivers report that their Class Vehicles consume or burn off as much as one quart or more of oil per 750-1,000 miles.

50. According to the owners' manual for the 2018 Jeep Compass, the vehicle's computerized diagnostic system identifies when it is time for an oil change based on measurements of oil "health" (as opposed to set intervals), which usually occurs between 3,500-10,000 miles depending on driving conditions.[1] The manual states that the oil should be changed every 4,000 miles if it is driven under conditions

---

[1] https://ownermanual.co/manual/2018-jeep-compass-owners-manual/pdf/ at p. 357.

FCA characterizes as "Severe Duty." Thus, under normal conditions, vehicles should be able to go over 5,000 miles between oil changes.

51.   Class Vehicles hold 5.5 quarts of oil. If an engine consumes one quart or more of oil per 750-1,000 miles, that means Class Vehicles can completely run out of oil before an oil change is recommended.

52.   As a result of this Defect, Drivers find that they are low on or even out of oil or that they regularly must add oil in between oil changes.

53.   The owners' manuals for Class Vehicles state that "[y]our vehicle is equipped with an automatic oil change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance."[2]   Despite these representations, drivers often report their engines stalling and their Class Vehicles low or out of oil without receiving a notification from the automatic oil change indicator.

54.   Upon information and belief, the Defect is caused by one or more problems which result in oil escaping past the piston rings and cylinder wall and entering the combustion chamber.  Once engine oil is in the combustion chamber, it will not only cause a decrease in engine performance but the engine oil will also be burned off during the Combustion Cycle sequence thereby reducing the overall amount of oil contained in the engine.

_____

[2] *Id.*

55.   This Defect poses a significant safety hazard for drivers as it can cause the vehicles to stall while in operation.  This occurs because the engine will shut itself off when it detects a low oil condition to prevent the engine from destroying itself.  Stalling most often occurs when the Class Vehicles are turning, accelerating, or decelerating, because during these maneuvers the oil sloshes to one side of the oil sump.  Stalling during these maneuvers can be particularly dangerous because it means the Class Vehicles can stall while turning at an intersection, or entering or exiting a highway, as examples.

56.   The Defect can also cause severe engine damage when a vehicle unexpectedly runs low on oil resulting in insufficient lubrication.

57.   Owners and lessees further incur considerable expense in the form of increased maintenance costs from continually having to add oil to their vehicles. Even while vehicles are still under warranty, oil changes and engine oil are typically not covered so owners must pay out of pocket.

58.   FCA, through its authorized dealerships and service centers, has failed to remedy the Defect.  FCA's repairs typically consist of simply topping off or changing the oil which does not fix the problem.  The only known fix is a full engine replacement which is extremely costly if an owner is out of warranty and which FCA often refuses to perform if the car is still under warranty or lease.  Even if an owner

does get an engine replacement, there is no indication the replacement engines are not susceptible to the same defect.

59.    Until the Defect is fixed by FCA, owners and lessees of Class Vehicles will continue to be at risk of dangerous engine stalling and engine damages and adding oil and frequent dealership visits will continue to be an ongoing expense and inconvenience.

60.    The Defect thus continues to pose a safety hazard as well as impacts the core functionality of the Class Vehicles.

**B.    FCA's Knowledge of the Defect**

61.    Plaintiffs' experiences are not isolated or outlier occurrences. The internet is replete with driver complaints on message boards, social media, and other websites concerning the Oil Consumption Defect.  For example, one consumer started a change.org petition related to oil consumption issues in 2017 and later Jeep Compasses. To date 122 people have signed.[3]

62.    FCA had a duty to disclose the Defect due to, *inter alia*, its knowledge that the Defect poses a serious safety hazard, the fact that the Defect goes to the central functionality of Class Vehicles, its superior and exclusive knowledge of the

---

[3] https://www.change.org/p/fca-us-FCA-group-make-jeep-acknowledge-and-recall-engines-with-oil-consumption-issues?recruiter=992004860&utm_source=share_petition&utm_medium=twitter&recruited_by_id=20ca52e0-bded-11e9-9821-e5d9bcefef7e

Defect and the fact that the Defect constitutes information reasonable consumers would want to know.  Moreover, FCA actively concealed the Defect, including by telling consumers that it is normal to burn oil at a rate of 1 quart per 1,000 miles.

63.    Numerous complaints about the Defect appear on websites FCA actively monitors, such as the website for the National Highway Traffic Safety Administration ("NHTSA") and Jeep owner message boards. Consumers have made well over 1,000 complaints about the Oil Consumption Defect through NHTSA alone.[4]  Many complaints posted on social media websites such as Facebook and Twitter also tag FCA or its divisions such as Jeep in the posts. Although FCA monitors these forums, it is difficult for potential consumers to do so, giving FCA exclusive knowledge of the Defect. The following are a sampling of the complaints submitted by Class Vehicle owners and lessees which date back to at least 2013[5]:

---

[4] Federal law requires automakers like FCA to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

[5] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.  The particular models/vehicles involved are set forth in the links in the footnotes as to the NHTSA complaints, and appear in the URL's, e.g., Jeep Cherokee, Chrysler 200, etc.

**FROM THE NHTSA**

**September 25, 2013 NHTSA ID NUMBER: 10545374[6]**

- WAS GOING TO PICK UP MY BOYFRIEND AND WHEN 3 MILES FROM HOME OIL PRESSURE LIGHT CAME ON. I WAS ON A MAJOR HIGHWAY AND WAS TRYING TO GET TO A SAFE PULL OFF SPOT WHEN THE CAR DIED IN THE MIDDLE OF THE HIGHWAY.(THIS SECTION OF HIGHWAY WAS AN AREA OF MAJOR SEMI-TRUCK TRAFFIC) ALL THE OIL HAD DRAINED OUT OF THE VEHICLE AND HAD TO HAVE THE CAR TOWED TO DEALERSHIP.

**July 16, 2015 NHTSA ID NUMBER: 10734584[7]**

- TL* THE CONTACT OWNS A 2015 JEEP CHEROKEE. WHILE DRIVING AT VARIOUS SPEEDS, THE LOW OIL PRESSURE AND BATTERY WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS ABLE TO RESTART. THE FAILURE RECURRED SEVERAL TIMES. THE VEHICLE WAS TAKEN TO A DEALER WHO WAS UNABLE TO DIAGNOSE THE CAUSE OF THE FAILURE. THE CONTACT MENTIONED THAT THE VEHICLE WAS LOSING EXCESSIVE OIL AND CONSTANTLY NEEDED OIL TO BE ADDED. THE VEHICLE WAS THE TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 4,800.

---

[6] https://www.nhtsa.gov/vehicle/2013/DODGE/DART/4%252520DR/FWD
[7] https://www.nhtsa.gov/vehicle/2015/JEEP/CHEROKEE/SUV/4WD

**November 13, 2015 NHTSA ID NUMBER: 10790238[8]**

- CAR STALLED WHILE OPERATING UNDER FULL POWER ON THE INTERSTATE. IT TOOK APPROX. 3 MINUTES AND IT FINALLY RESTARTED. TOOK CAR TO DEALERSHIP. THEY STATE CAR IS NOT PART OF ANY RECALL BASED ON VIN #. THEY STATE STALLING WAS RESULT OF EXTREMELY LOW OIL. HOWEVER, THE CARE HAS NO LEAK AND DOES NOT BURN OIL. IT IS SYNTHETIC OIL AND IT SIMPLY BREAK DOWNS AND DISSIPATES. I DON'T BELIEVE THEM. THIS IS THE SECOND TIME THIS CAR HAS DONE THIS

**November 17, 2015 NHTSA ID NUMBER: 10793237[9]**

- 2 TIMES ALREADY I HAVE HAD TO TAKE MY CAR INTO THE DEALERSHIP BECAUSE IT WOULD SHUT OFF RANDOMLY WHILE DRIVING. THIS HAS HAPPENED WHILE ON THE HIGHWAY AND ALSO WHILE ON BUSY STREETS. SO FAR I HAVE BEEN ABLE TO DRIFT TO THE SIDE OF THE ROAD, PUT THE CAR IN PARK AND THEN TURN THE CAR OFF AND BACK ON. THE CAR SPUTTERS WHEN RESTARTING AND ON MULTIPLE OCCASIONS WILL STALL AGAIN. BOTH TIMES THEY TRIED TO BLAME IT ON THE OIL CHANGE BEING OVERDUE. THE 2ND TIME I HAD TO HAVE THE CAR TOWED TO THE DEALERSHIP AND THEY STATED THERE WAS NO OIL IN THE CAR. HOW A CAR LOSES OIL IF THERE ISN'T A LEAK, I'M NOT SURE. THIS IS NOW THE THIRD TIME IT IS HAPPENING AND BASED ON THE CAR'S COMPUTER I STILL HAVE 30% TO GO BEFORE NEEDING AN OIL CHANGE AND THE CAR IS SHUTTING OFF ON ME AGAIN RANDOMLY.

---

[8] https://www.nhtsa.gov/vehicle/2013/DODGE/DART/4%252520DR/FWD
[9] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD

**January 18, 2016 NHTSA ID NUMBER: 10820830[10]**

- NEW 2015 JEEP CHEROKEE LATITUDE WITH 4K MILES ON IT
  SUDDENLY TURNED ITSELF OFF WHILE DRIVING DOWN THE
  ROAD. NO WARNING OTHER THAN A MESSAGE ON THE DASH TO
  PUT THE CAR IN PARK TO CHANGE GEARS. VERY DANGEROUS,
  LOST CONTROL OF POWER STEERING, GAS AND BRAKES. WAS
  ABLE TO PUT CAR IN PARK ON SIDE OF ROAD, RESTART IT AND
  GET HOME. IT HAPPENED AGAIN THE NEXT MORNING AND WAS
  TOWED TO DEALERSHIP. SERVICE DEPT. RAN ALL UPDATES AND
  THE CAR SHUT OFF ON THEM WHILE TESTING IT TOO. HAS BEEN
  IN THE SHOP FOR 2 WEEKS AND THEY SAY IT WAS DUE TO
  EXCESSIVE OIL CONSUMPTION AND AR REPLACING THE ENGINE.

**November 10, 2016 NHTSA ID NUMBER: 10925430[11]**

- WHEN SLOWING FOR A STOP SIGN THE CAR STALLED ONCE 5
  DAYS AGO BUT RESTARTED AFTER SHUTTING DOWN AND IT
  WAS FINE. THEN YESTERDAY MORNING IT STALLED 3X BEFORE
  LEAVING MY DEVELOPMENT. I DROVE TO HAVE THE BATTERY
  CHECKED LOCALLY AND IT WAS OK. I DROVE TO THE
  DEALERSHIP WHO TOLD ME THE PROBLEM WAS BECAUSE THE
  OIL WAS LOW, THAT THESE CARS BURN A QUART OF SYNTHETIC
  OIL EVERY 2000 MILES AND "WHEN THE OIL RUNS LOW THEY
  SHUT OFF TO PROTECT THE CAR." WHAT?? AND HOW
  DANGEROUS

---

[10] https://www.nhtsa.gov/vehicle/2015/JEEP/CHEROKEE/SUV/4WD
[11] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD

18

**May 10, 2017 NHTSA ID NUMBER: 10984771[12]**

- AFTER WORK I GO TO START MY CAR AND THERE WAS A HARD START AND THEN MY CAR DIED. THE ENGINE FELT LIKE IT WAS GOING TO POP OUT OF THE HOOD. WELL, CHRYSLER WAS INFORMED AND MY CAR WAS TOWED NEXT DAY TO THE DEALERSHIP. MY SERVICE MAN CALLED APPROXIMATELY 45 MIN AFTER MY CAR WAS DELIVERED TO THEM EXPLAINING TO ME I WAS ABOUT 2 QUARTS LOW ON OIL. THIS IS IMPOSSIBLE I EXPLAINED TO HIM. ON THE DRIVER SIDE THERE IS A STICKER SHOWING I JUST GOT MY OIL CHANGE NOT TO LONG AGO. MY SERVICE MAN SAID THIS IS A KNOWN PROBLEM WITH THIS ENGINE.

**June 25, 2017 NHTSA ID NUMBER: 11001288[13]**

- THE ENGINE HAS BEEN STALLING WHILE IN MOTION AND SHIFTING INTO NEUTRAL. THE DEALERSHIP TOLD ME AFTER THE 2ND TIME IN FOR THIS PROBLEM THAT THE VEHICLE WAS 3.5 QUARTS LOW ON OIL AND THE ENGINE HAD SHUT OFF TO "PROTECT ITSELF" . THE CAR HAS BEEN PARKED FOR IN MY GARAGE FOR 3 DAYS, AFTER DRIVING IT FOR ABOUT 3 MILES THE CHECK ENGINE LIGHT CAME ON, UPON CHECKING IT IS AGAIN LOW ON OIL. I HAVE HAD THE CAR SERVICED AS RECOMMENDED AND DON'T UNDERSTAND THIS SUDDEN OIL USE, THERE ARE NO SIGNS OF LEAKAGE OR SMOKING, AND THE WARNING SYSTEM IS NOT INDICATING LOW OIL PRESSURE.

---

[12] https://www.nhtsa.gov/vehicle/2015/CHRYSLER/200/4%252520DR/FWD
[13] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD

**July 31, 2017 NHTSA ID NUMBER: 11011670[14]**

- THE CONTACT OWNS A 2014 JEEP CHEROKEE. WHILE DRIVING AT UNKNOWN SPEEDS, THE VEHICLE BURNED AN EXCESSIVE AMOUNT OF OIL AND STALLED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC. THE LOCAL DEALER WAS NOT CONTACTED. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND OPENED CASE NUMBER: 32089788. NO FURTHER ASSISTANCE WAS OFFERED.

**September 4, 2018 NHTSA ID NUMBER: 11124329[15]**

- ENGINE OIL AND STALLING. I WENT FOR MY 2ND OIL CHANGE 8/27/2018. THE SERVICE TECH AND A MECHANIC LISTENED WHEN I SAID THE OIL WAS BASICALLY GONE AND MY HUSBAND HAD TO ADD 2 QUARTS. I EVEN CHECKED ALL THE SYSTEM WARNINGS AND THERE IS NONE FOR LOW OIL. WHEN PULLING OUT INTO AN INTERSECTION THE CAR TOTALLY SHUT OFF AT 4 DIFFERENT TIMES. SO THE MECHANIC SAID YES THOSE 2.4 ENGINES BURN 1 QUART EACH 1000 MILES AND WHEN THE OIL IS LOW THE ENGINE WILL JUST STOP. I ASKED ABOUT WHY THERE ARE NO WARNING LIGHTS, THE MECHANIC AGAIN SAID YES THERE IS NOT ONE. HAVING A CAR JUST SHUT OFF IS SO DANGEROUS. IT COULD HAVE BEEN A TERRIBLE ACCIDENT IF ANOTHER CAR WAS COMING ANY OF THOSE 4 SHUT OFFS.

---

[14] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD
[15] https://www.nhtsa.gov/vehicle/2017/JEEP/COMPASS/SUV/4WD

**FROM CARCOMPLAINTS.COM – 2018 COMPASSES**

**#159 from Putnam Valley, NY, September 12, 2019**[16]

- "On three different occasions my engine has shut off and gone into a limp mode while I am driving without any warning or indicator light activation. This has occurred while driving at high speeds and has nearly resulted in more than one multi-vehicle accidents. The parking brake engages and I am unable to restart the vehicle for several minutes thereafter. I was nearly rear ended on both occasions and had no ides what was wrong. Come to find out, there was minimal oil in the engine despite being dealer maintained in a timely fashion and well before the next oil change was due. I immediately took my 2018 Jeep Compass in for servicing where they explained they have been seeing this issue in this particular model with the 2.4 liter multi-air 4 cylinder engine. The PCV valve was replaced and they started to monitor oil usage via an oil consumption test every 500 miles. Unfortunately the PCV valve replacement did not prove to be the fix as the engine malfunctioned once again sometime around 2500 miles into the oil change. I am extremely concerned for my safety and rely on this vehicle to get me to work as I am a healthcare professional. I am shocked that a recall has not been issued after reading online just how many cases have been reported with the same make/model engine. I am lucky that I was not seriously injured and it is just a matter of time before someone is, if action is not taken. I was merging onto a 4 lane highway during rush hour traffic with no shoulder the first time this occurred. Traffic was moving at 65 miles per hour. It was absolutely frightening. This is unacceptable and is a detriment to highway and personal safety. My sales associate at the dealership is also alarmed at just how many 2018 Jeep Compass with the 2.4 liter engine are having this unequivocal hazardous issue. Something must be done asap."

---

[16] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml

**#165 from Brentwood, CA, January 16, 2020[17]**

- "2.4L multiair motor burns oil at excessive rate. New car burns 1qt of oil per 850 miles. No "low oil" indicator light. When low on oil, car stalls, jolts, or shuts off. Stall generally occurs when turning at low speeds (less than 30 mph). Significant safety hazard if turning in front of oncoming traffic. Car will stall if down 2 quarts. Therefore, if you do not refill oil every 1500 miles, you risk stalling on roadways. Current vehicle has 26,000 miles. Normally add 5 quarts of oil between scheduled oil changes. Stalling has occurred approximately 10 times. Two times stall occurred in intersection, almost resulting in high speed collision from opposing traffic."

**#166 from Baden, PA, January 16, 2020[18]**

- "My car is not even 2 years old and it has completely shut down twice while driving. Very quickly a low oil pressure warning sign will flash on the dashboard, and soon after the car becomes limp and completely shuts down. It will not move and doesn't allow further driving. The dealership found my oil is low, even though I haven't even hit 2500 miles since my last oil change. They are having me come back after 500 miles to monitor oil consumption and investigate further. This is extremely frustrating and dangerous, as it has shut off when I'm on main roads with cars all around me. I'm very disappointed, as I have never had any issues with previous Jeep I've owned."

**#167 from Brantford, CA, January 16, 2020[19]**

- "The Jeep Compass 2018 car just stops in the middle of driving. There is no oil light to indicate it is low on oil. This is a serious safety hazard. This has happened twice. The car eats oil. Dealer said to drive for 2000 miles and bring it in. I am terrified of driving it. It needs a new englenle [sic]"

---

[17] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml
[18] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml
[19] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml

**#171 from Porter Corners, NY, January 15, 2020[20]**

- "Two days in a row the engine shut down less then one mile into my morning commute as I was turning onto the main road out of my development. The engine shut off, the steering became difficult, and the parking brake engaged. No warning lights came on, and nothing indicated why the car was shutting down. When taken into the dealer after the second incident in as many days, I was told the engine was low or out of oil and shutting down is a safety feature as is engaging the emergency brake in traffic. I wasn't due for an oil change for another month based on Jeep's recommended schedule, but I was forced to do one so they could verify the issue. I was also told the Compass has a new highly efficient engine and these new engines are so efficient they burn/leak oil, and I am to check my oil every 500-1000 miles and always have a quart in the car to top it off. When I asked why there wasn't a dashboard indicator the oil was low I was told the Compass does not have such an indicator. I am concerned for my safety, my family's, as well as other drivers as I do not know when the car will shut down again.

**#172 from Crystal Lake, IL, January 27, 2020[21]**

- "My Jeep Compass turns off while driving. The low oil pressure light comes on and the parking break turns on in the middle of the street, more than 4 times. Took my Jeep to a dealership, they said don't worry you just need an oil change. I stated that my check oil light did not come on, the engine light did not come on, and the change your oil light did not come on. How am I supposed to know the oil pressure is low? the light only flashes for a second, until the vehicle turns off. The first couple times, I was unaware the light flashed. I was to busy trying to avoid being hit from behind. I had to turn on hazards, figure out the parking break engaged and panic. That is a hazard on the road. I inquired if there was a recall or any injuries or deaths due to the issue. The answer was not yet. The 2.4 burns oil, everyone has this problem. I don't find acceptable. I have to drive this

---

[20] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml
[21] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml

car at least 6 more years. It is not a safe vehicle. The Jeep has died backing up in parking lot. The Jeep dies during turning both right and light on busy streets. And once, I turned left drove 4 cars length and stopped dead in traffic on a busy street."

## FROM CARCOMPLAINTS.COM – 2017 COMPASS

## #40 from Carlisle, PA, November 7, 2017[22]

"Engine has excessive oil consumption which causes the vehicle to just stall out. Recommended 5000 oil changes but dealers will say 3000 and to check oil every 2 days because it may need 4-5 qts between oil changes. This started within 5 months of driving it off the showroom floor. Dealer and Chrysler Corp are aware of issues but no fix has been discovered not do they care. My daughter and her 2 babies were almost killed when it just stalled exiting a major freeway and an 18 wheeler right behind her...case manager (3rd case since 2017) at fca was oh, so scary. this is a serious, deadly issue and dealers omit things from the system, perform the consumption tests improperly or donT record them at all so they will not have to do what's right. The vehicle will totally shut down while turning, emergency brake will apply and it takes a bit to get it started again. Sometimes lights on dash will all flash on or sometimes just the oil light (even within 2 weeks of an oil change)."

## CARPROBLEMZOO.COM

## 2018 Jeep Compass, failure date 5/15/2019[23]

- "The engine burns oil at an extremely fast rate. Every 3,000 miles there is no oil left in the car and the car will stall out while driving with no warning. It is an extreme safety hazard and somebody is going to get killed if this happens at the wrong time."

## 2018 Jeep Compass, failure date 6/1/2019[24]

- "While driving down the freeway at about 65 miles per hour, without warning this Jeep stalls, putting my wife in a potentially fatal or injurious

---

[22] https://www.carcomplaints.com/Jeep/Compass/2017/engine/engine.shtml
[23] https://www.carproblemzoo.com/jeep/compass/engine-burning-oil-problems.php
[24] https://www.carproblemzoo.com/jeep/compass/engine-burning-oil-problems.php

accident situation. Dealership said they know and accept as normal this brand new car burning a quart of oil every 2000 miles and that if the car gets low on oil it will quit running, but they never tell the owner of the car, they only say come back in 5000 miles for next oil change, meanwhile the car starts stalling at 3-4000 miles."

## FROM CARCOMPLAINTS.COM – 2015 JEEP RENEGADE

### JM., Antioch, IL, December 1, 2017:[25]

- "After running almost out of oil, NO OIL PRESSURE, car had to be towed in. NO Charge for the tow. Dealer changed oil, claimed oil was dirty. Charged me for the oil change. They added a die to the oil. This would help show any leaks that might occur. They told me to drive it for 1,000 miles then bring it back. I brought it back, and it was almost 1 quart low. According to them, that is normal. There are no leaks anywhere. This car is supposed to go 5,000 miles between oil changes. HOW IS THAT POSSIBLE IF IT BURNS A QUART EVERY 1,000 MILES."

## JEEP RENEGADE - JEEPRENEGADEFORUM.COM

### Sheepdoggie, 9 months ago[26]

- "I have had the same exact issue with my 2018 Jeep Renegade Limited. It comes down to safety. New cars stalling while driving without any warning is a definite problem. Being bone dry on oil every couple thousand miles and no safety indicators equals a very unsafe/unreliable car. I have read so many carbon copies of the same exact problem. My car stalled in

---

[25]https://www.carcomplaints.com/Jeep/Renegade/2015/engine/excessive_oil_consumption.shtml
[26]https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-3

traffic while turning on several occasions beginning at 2,300 miles. Filled it with oil and it began stalling again at 5,500. No warnings, no indicators.

**Mcsebs76, four months ago** [27]

- "I have had my 2017 jeep renegade at 2 different dealerships for them both to tell me the same thing. by the time i get it into the shop after doing the same thing you are saying, they tell me nothing is wrong. Let's do yet another oil consumption test that they are going to tell me that it is consuming the correct amount of oil for this particular jeep engine. The dealership told me yesterday that because the 2.4 engine was made to use 0W 20 oil, it is very thin and uses more. They want me to come in for another oil consumption test and have it checked every 1000 miles for the 5000 miles. That means i have to find the time to get to the dealership 5 times to get this done. Just so they have documentation in case something happens to the motor it is documented. Otherwise, I need to check my oil every time i fill up the gas tank and add oil when necessary."

**Jen d, 3 months ago** [28]

- "I am having the same problem with my 2018 Renegade. They keep telling me to get an oil change and it will fix. It works for maybe 1000-2000 miles into my oil change and the same problem happens. They car stalls out without warning. It happened the other day in a high traffic area and I came within inches of getting hit. I don't feel safe at all in this car but if I trade it in I will take a huge loss. The dealer I bought the Jeep at is no help and neither is Jeep themselves. It seams like a common problem for a lot of people. Something should be able to be done. Obviously there is a problem somewhere"

---

[27] https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-6
[28] https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-5

**Aqualoon, 28 days ago**[29]

- "2017 Trailhawk, bought new in 2018, has 40k miles on.

    This just happened to me on my way into work, going 65 on the highway and the engine dies/stalls. 7 times out of 10 I would have been in an accident on this road (speed limit is 60 but people will ride you if you go under 70) and was very lucky. Took 3-4 times to get it restarted and it drove just fine into work. Before, during and after this there was no indicator lights on the dash - nothing. Last oil change was in mid December.

    And no, I don't check my oil at every fuel up, nor do a lot of people as I rarely ever see anyone with their hood up at the gas station while they're fueling. I called my nearest Jeep dealership and spoke with a technician, he knew of the issue right away and just said to top it off. Said that these things burn through oil like that and that was that. I'll be topping it off and then getting my oil changed this afternoon. And from now on checking it every month and keeping a spare quart or two in my vehicle."

**CARPROBLEMZOO.COM**

**2016 Jeep Renegade, failure date 6/21/2019**[30]

- "Driving down a long winding hill when acceleration and brakes went out. I was able to stop the car with the emergency brake. No warning lights before or during. Towed to dealership where I was told that it had burned through 4 quarts of oil and that I needed to take it back to do an oil consumption test. There is no way I'm getting back into a vehicle that has no brakes during safe mode and has no warning that anything is wrong. Jeep needs to get these off of the road before it kills someone."

---

[29]https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-6

[30]https://www.carproblemzoo.com/jeep/renegade/2016/engine-burning-oil-problems.php

**2016 Jeep Renegade, failure date 11/3/2018[31]**

- "Around 40,000 miles my car started consuming oil at an alarming rate. The dealership service department said it was normal for my car to consume 1 quart per 750 miles! that is insane. That said, FCA guideline for cars is 1 quart per 2000 miles for cars below 50,000 miles. The dealership has refused to repair my engine. I can't even go 2500 miles on an oil change without my car seizing up, stalling, having errors codes (low oil pressure, oil light comes on, electrical error), won't accelerate over 35 miles per hour. This all happens while I'm driving with no warning! very dangerous on a freeway! even the guideline for cars over 50,000 miles the guideline being the car can burn 1 quart every 750 miles is ridiculous. I've owned older models that never did that. Is this a new car thing? new cars just burn ridiculous amounts of oil? to what end?."

**2016 Jeep Renegade, failure date 10/23/2019[32]**

- "Update to complaint # 11270456 reported on 10/23/19. I called Jeep directly to report the issue and they instructed me not to pick the car. They called dealership directly. They are aware of an "oil consumption issue" with 2016 Renegades which is related to the car stalling/going into neutral and the gear shifting issue. Since they did an oil change on 10/22/19, they want me to put 1,000 miles on the car & bring it back for an oil consumption test. Depending on the results of that test, they may have to replace the engine."

---

[31] https://www.carproblemzoo.com/jeep/renegade/2016/engine-burning-oil-problems.php

[32] https://www.carproblemzoo.com/jeep/renegade/2016/engine-burning-oil-problems.php

**JEEP CHEROKEE - CARPROBLEMZOO.COM**

**2016 Jeep Cherokee, failure date 8/5/2016[33]**

- "We bought a brand new Jeep and by 5168 miles it used 3 quarts of synthetic oil. We had the oil changed at 3000 miles at the dealer(as they suggested). We informed the dealer that the Jeep was burning oil not leaking oil. We were told that FCA would not do anything about it until 7500 miles and then they would do a oil consumption test on the Jeep and after that we would have to bring it back every 500 miles to top the oil off if necessary. Synthetic oil is about $8. 00 a quart. This Jeep is under warranty but they wouldn't fix it. And we would of had to pay for the oil to top it off with too. The dealer was aware of this problem with these Jeeps. Our daughter bought a Jeep with the same engine but she hasn't had a problem with hers. When we told the dealer this they said this problem exists only with some of the engines. Why isn't there a recall on these! why are they even selling these when they know there's a problem. Since the manufacture wouldn't fix the problem we got rid of the Jeep."

**CARCOMPLAINTS.COM – 2017 CHEROKEE**

**Solangel N., Tuscon, AZ, May 5, 2019[34]**

- "Car ran out of oil at ~5K miles after having served at the dealers. They told me it is a known problem with Cherokees: Excessive Oil Consumption. Then why do they keep selling them!!!!!

  My car completely stalled as I was going to enter the ramp to the I10. It could have been very bad if it happened once I entered the I10. I had my 1 year old with me in the scorching hot sun of Tucson Arizona waiting for a tow truck.

---

[33]https://www.carproblemzoo.com/jeep/cherokee/2016/engine-burning-oil-problems.php
[34]
https://www.carcomplaints.com/Jeep/Cherokee/2017/engine/excessive_oil_consumption.shtml

They are doing oil consumption tests now on my vehicle. This is the second one. The first one they said the consumption looked normal. Then why in the world did my car run out of oil?"

**Louis G., Stockton, May 1, 2019[35]**

- "Makes dinging sounds when turning right or left, Car dies out when making turns , no oil on dip stick, need to constantly add oil about every two weeks, have taken to dealership and they told me that is just the way that these jeeps are.... and that I need to keep checking the oil consumption, just doesn't seem right, I always had high expectations for jeep, but now I am not to sure anymore, especially when I found out that a lot of people are going through the same issue and Jeep is aware of it and not recalling these vehicles"

**CARCOMPLAINTS.COM – 2016 CHEROKEE**

**Andrew R., Mooresville, NC, November 1, 2017[36]**

- "When the vehicle was under 50k miles it was burning a quart every thousand miles, which FCA said was acceptable. They advised oil change intervals at 5000 miles and the oil capacity is five quarts. Now that it has over 50k on it, they advised it's acceptable to burn a quart every 750 miles. The dealership won't work with me and FCA told me it was the TRANSMISSION that is causing it to burn oil!"

---

35

https://www.carcomplaints.com/Jeep/Cherokee/2017/engine/excessive_oil_consumption.shtml

36

https://www.carcomplaints.com/Jeep/Cherokee/2016/engine/excessive_oil_consumption.shtml

**Robert I. in Severna Park, MD, May 26, 2017[37]**

- "I purchased a 2016, Jeep Cherokee with 20,211 miles on it. At 24,311 the oil light comes on when taking a turn. I stop and check the oil level and the Jeep is 3.5 qts low! I fill it up and then change the oil/filter. I called Jeep and currently am running a Consumption Test through the dealership where I was also told 1 quart 1000 miles is acceptable. I'm selling it if it can't be fixed. Stay tuned .....

  Update from Jun 18, 2017I completed by oil consumption test with Tate Jeep of Glen Burnie, MD. In 2 weeks we put 1050 miles on the 2016 Jeep Cherokee. Jeep said 1 qt in 2000 miles is too much for a vehicle with less than 50K miles. They performed a cylinder wall examination and said there was severe scoring of at least 2 cylinder walls. They submitted a request to Jeep Corporate for an engine replacement and it was accepted within a day. Jeep then ordered and replaced the engine 2 days later! Yea Jeep!"

**Kathie T. in Anaheim, December 10, 2018[38]**

- "We have had our Cherokee for 2 1/2 years. We had the engine replaced at 20k miles due to severe scoring of the cylinder walls as a result of oil consumption causing the car to shut off/stall. NOW... 23k miles later we are replacing the engine AGAIN! The car was taken in due to battery losing charge thinking it was the alternator. NOPE, they checked the cylinder walls of the engine and found scouring again as well as oil gathering where the spark plugs are and he called it "blow-by". This is CRAZY! I want an old car with a heavy solid engine!"

---

[37]

https://www.carcomplaints.com/Jeep/Cherokee/2016/engine/excessive_oil_consumption.shtml

[38]

https://www.carcomplaints.com/Jeep/Cherokee/2016/engine/excessive_oil_consumption.shtml

## CARCOMPLAINTS.COM – 2017 CHEROKEE

## rbriggs, Hamilton, March 12, 2018[39]

- "Car was purchased new May of 2017. Now 10 months old, (6,960 miles) Jeep dinging at random, no warning lights or messages noticed on dash. Prior to this (approx. 6,500 miles) we called the dealer to see what the oil change warning would be ,the owners manual was not helpful, (in the past we changed the oil every 3000 miles on other cars). We were told that the car would tell us on the dash when an oil change was due.

  At 6,990 miles the car stalled, 2 tries later it started. There were no visible warning lights.

  Called the dealer to get it checked out and to go ahead and change the oil also. We were told by service that the oil dipstick was dry. They were aware of a problem with another customer that this particular engine has had problems with excessive oil consumption and their engine was replaced after 2 months of documentation with FCA. We will have to take the car in every 1,000 miles for documentation (looking for engine scoring) for FCA to move forward with this problem.

  Our annoyance is if FCA/Jeep has been aware of this problem for two years at least, why are they still selling these vehicles and there is no recall. Are there not enough injuries or deaths to get their attention?? Do they just say "Sorry about your Luck ! " ( If you were a patient in the operating room would you want that motto ? OOPS, sorry about your luck !!) There is nothing shown for Our inconvenience. This makes us feel that we have a new car with limited sense of confidence to drive it.. FCA/Jeep needs to show us that they care about this problem.

  Update from Mar 14, 2018 Car stalled while driving.

---

[39]

https://www.carcomplaints.com/Jeep/Cherokee/2017/engine/excessive_oil_consumption.shtml

Update from Sep 10, 2018 After several trips back for service the engine was replaced in May. It is now September and the car is going back in due to oil consumption on the 2nd engine. Buyer beware 2.4 liter engines!"

## CARCOMPLAINTS.COM – 2014 CHEROKEE

### Jason W, Toms River, NJ, June 17, 2015[40]

- "So I've been reading that this is a problem with the particular Jeep and even the dealer admits it and can do nothing for me. I've had the Jeep go bone dry and shut down after 5k miles on multiple occasions prior to realizing this was an ongoing issue. This time I had the oil changed 3200 miles ago and the engine seized this morning. If this happened on the highway I could see it resulting in injury or death. The manufacturer does nothing, the dealer does nothing. I'm told for them to do anything it has to meet lower then whatever the standard were for a vehicle to burn which was something like a quart per 1k miles. This time around it did and I imagine it's not going to be improving. Don't buy this year Jeep and I think 2015 has the same problems."

### Enrique G., Destrehan, June 26, 2017[41]

- "READ THIS BEFORE BUYING THIS CAR!!
My engine started burning oil at around 40,000 miles (that I could notice). It burned so much in between oil changes that the engine SHUT DOWN in the middle of the road with NO WARNING. It had consumed all the oil to empty in about 6000 miles. I took it to the dealer who recommended to Chrysler that the engine be replaced. Chrysler responded that it did not approve the

---

[40]

https://www.carcomplaints.com/Jeep/Cherokee/2014/engine/excessive_oil_consumption.shtml
[41]

https://www.carcomplaints.com/Jeep/Cherokee/2014/engine/excessive_oil_consumption.shtml

procedure because "WE HAVE NO REASON TO CHANGE. NEEDS TO BE AT 1000 MILES PER QUART" this quote is from the reports I received with my invoice. In conclusion, they did nothing because per Chrysler, THEIR ENGINES ARE OK IF THEY CONSUME UP TO 1 QUART OF OIL FOR EVERY 1000 MILES. This means I have to add up to 6 quarts of oil in between oil changes. Per the dealer recommendation, I should keep oil in my car and check the oil every time I add gas. Is this normal for a 3-year old, 50,000 mile car??? I would recommend to stay away unless you are willing to take the risk on the engine."

## CARCOMPLAINTS.COM – 2016 DODGE DART

**#11 from Kissimmee, FL,** December 10, 2017[42]

- "The contact owns a 2016 Dodge Dart. In October of 2016, while driving 25 mph, the vehicle stalled without warning. The vehicle was taken to a local dealer where it was diagnosed that there was inadequate oil in the vehicle during production, which caused the sensor to shut the vehicle down. The vehicle was repaired, but the failure recurred. While driving 40 mph, the oil indicator was flashing. The vehicle was taken back to the dealer where a compression test was completed. The dealer diagnosed that the oil was evaporating and the engine needed to be replaced. The vehicle was not repaired. The manufacturer was notified of the failure and denied the claim. The manufacturer advised the contact to add oil and refer to the owner's manual. The failure mileage was 15,638."

## CARCOMPLAINTS.COM – 2015 CHRYSLER 200

**#226 from Bellevue, OH, July 17, 2017[43]**

- "My husband and I went on a trip from bellevue, Ohio to fort wayne, Indiana. Around 300 miles round trip, give or take. My husband checked the oil before we left and it was fine. No problems on the ride there. After

---

[42] https://www.carcomplaints.com/Dodge/Dart/2016/engine/engine-2.shtml
[43] https://www.carcomplaints.com/Chrysler/200/2015/engine/engine-12.shtml

the car sat for 3-4 hours we were leaving the park, going down a hill with a curve at the bottom and the car just dies. No steering and no brakes. All the lights on the dash came on. We had no idea what was going on. We almost hit a camper. The only thing that stilled worked was the radio. The car finally stops on its own. My husband puts it in parking and checks on the outside of the car to make sure we didn't hit anything. When he true to start the back up, it struggles the first two tries. The third time it turned over. No lights on dash to explain the stall. We nervously drive the car all the way home. I called the dealership the next morning. We took the car in to be checked out. Dealership had the car over night. We go in to pick up our car and they tell us that they had to put 3 3/4 quarts of oil in it. It being low on oil caused the safety feature in the car to shut the engine down. Didnt know about this feature. We were also informed that since our car had over 50,000 it will burn through a quart of oil every 750 miles..seriously."

## TWITTER

**Saltyred @Jeep, February 28, 2020[44]**

- "when are yall going to fix the cherokees from not burning oil and shutting off when people are driving them??? This is very dangerous and needs to be addressed immediately. Coming from an owner of a 2019 Jeep Cherokee whose oil is burning bad and just randomly shut off"

**Amy Sue, February 13, 2020[45]**

- "I bought a new @Jeep Cherokee thinking I was getting a safe, reliable vehicle for me and my two young children. Little did I know my jeep would have major oil consumption issues and shut off with me and my children in the middle of a busy highway with no warning."

---

[44] https://twitter.com/saltyred_mxr/status/1233461642761003009
[45] https://twitter.com/amyrenaewright/status/1228112267637641218

**Brian S @bmsmithvb @Official MOPAR @NHTSAgov @FiatFCA NA, December 24, 2019[46]**

- "How is it safe when my 2018 Jeep Cherokee Limited just dies in the middle of the road? I am under the factory recommended 3,500 mile oil change. Several thousands of others online are reporting the same. Is anyone investigating this?"

**Dan @corrigda25, February 11, 2020[47]**

- "Don't buy a 2019 @Jeep cherokee. The engine burns oil and this causes the engine to stall. When I called, the only thing @FCA and @Jeep could recommend is to carry extra oil in the car. They also claim its normal for the engine to stall. I would never recommend buying a Jeep"

64.   In addition to being on notice of the Oil Consumption Defect through NHTSA and other online complaints which date back to at least 2013, FCA also directly learned of the widespread oil consumption problems from its network of dealerships. Many of the customers who wrote online or to FCA about their bad experiences with the Defect report having taken their Class Vehicles into FCA dealerships because of the Defect. Upon information and belief, FCA began to see complaints related to the Defect through its dealers as early as 2012 when it began selling the 2013 model-year Class Vehicles.

65.   Confirming its knowledge and concealment of the Defect, FCA and its dealerships often tell drivers that it is normal for Class Vehicles to burn up to 1 quart

---

[46] https://twitter.com/bmsmithvb/status/1209513934862110727
[47] https://twitter.com/corrigda25/status/1227418580008013826

of oil every 750-1,000 miles even though, as described above, this directly conflicts with FCA's own recommended maintenance schedule.

66.   Despite its knowledge of the Oil Consumption Defect, FCA failed to disclose it to Plaintiffs and other Class Members. FCA could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through its network of dealers, in owners' manuals, on its website, in Class Vehicle brochures, and on Class Vehicle Monroney stickers. Had FCA disclosed the Defect in any of these places, reasonable consumers would have been aware of it.

67.   The Oil Consumption Defect first manifested in the 2013 Dodge Dart and then several 2014 model year vehicles.  Despite receiving complaints from drivers of these vehicles, FCA continued to design, manufacture, and sell six additional model years of cars across five different brands with the same engine and therefore the same Defect and without informing prospective buyers about the Defect. In fact, FCA continues to put the same defective engine in new vehicles.

68.   Not only did FCA continue to put the same defective engine into many successive model years, but it debuted several entirely new vehicles within this time period. For example, FCA introduced the Jeep Compass for the 2017 model year. After four years of mounting complaints about the Defect in other FCA vehicles, as well as the additional prerelease testing that would go into the launch of a an entirely new vehicle, FCA clearly knew about the Defect before it launched the Jeep

Compass.  On information and belief, there are no significant differences between the engines as installed in the Class Vehicles or in the way in which they are installed that would impact oil consumption as between the different models of Class Vehicles.

69.    Despite its long-running knowledge of the Oil Consumption Defect, FCA still does not inform prospective buyers about the Defect. Nor has FCA developed an effective fix for the oil consumption problem it causes.

70.    As a consequence of FCA's action and inaction, Class Vehicle owners have been deprived of the benefit of their bargain, subjected to hazardous engine stalling risks, and incurred lost time and out-of-pocket costs from frequent dealership visits and increased maintenance costs. Class Vehicles also have suffered a diminution in value due to the Defect.

71.    Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

## TOLLING OF STATUTES OF LIMITATIONS

72.    Because the Oil Consumption Defect cannot be detected until it manifests, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing or leasing their Class Vehicles, despite exercising due diligence.

73.     Plaintiffs and Class Members had no realistic ability to discover that the engine was defective until it prematurely failed or began exhibiting oil consumption problems and would have no reason to believe that the issues they were experiencing were caused by a widespread, systemic defect. Therefore, the discovery rule is applicable to the claims asserted by Plaintiffs and Class Members.

74.     As alleged herein, FCA has known about the Oil Consumption Defect since at least 2012 and has failed to disclose and actively concealed the existence of the Defect to consumers. Therefore equitable tolling of statute of limitations is also applicable to the claims asserted by Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

75.     This action is brought and may be maintained as a class action, pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure.

76.     The Class is defined as follows:

> All persons in the United States who bought or leased, other than for resale, a Class Vehicle (including 2014-2020 Jeep Cherokees, 2015-2020 Jeep Renegades, 2017-2020 Jeep Compasses, 2013-2016 Dodge Darts, 2015-2020 Ram ProMaster City's, 2015-2016 Chrysler 200's, and 2016-2020 Fiat 500X's).

77.     In addition, state subclasses are defined as follows:

> **Florida Subclass**
> All persons in the state of Florida who bought or leased, other than for resale, a Class Vehicle.

39

**Ohio Subclass**
All persons in the state of Ohio who bought or leased, other than for resale, a Class Vehicle.

**Wisconsin Subclass**
All persons in the state of Wisconsin who bought or leased, other than for resale, a Class Vehicle.

78.    Excluded from the Class are FCA, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

79.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of FCA and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least hundreds of thousands of Class Vehicles have been sold and leased nationwide. Members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by FCA in connection with its sales and leases of Class Vehicles.

80.    **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These

questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

        a.      whether FCA engaged in the conduct alleged herein;

        b.      whether Class Vehicles are defective;

        c.      whether FCA placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

        d.      whether FCA knew or should have known of the Defect, and if so, for how long;

        e.      when FCA became aware of the Defect in the Class Vehicles;

        f.      whether FCA knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

        g.      whether FCA's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

        h.      whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

        i.      whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

41

j.       whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of FCA's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.       whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

81.   **Typicality**: Plaintiffs' claims are typical of the claims of the Class because the Plaintiffs purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by FCA's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against FCA relating to the conduct alleged herein, and the same conduct on the part of FCA gives rise to all the claims for relief.

82.   **Adequacy**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

83.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.

The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

84.   **Injunctive Relief**: FCA has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Florida's Deceptive and Unfair Trade Practices Act**
**FLA. STAT. § 501.201, *et seq*. ("FDUTPA")**
**Plaintiff Romanchuk Individually, and on Behalf of the Florida Subclass**

85.   Plaintiff Romanchuk incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

86.   Plaintiff Romanchuk brings this claim on behalf of the Florida Subclass.

87.   Plaintiff Romanchuk, and Florida Subclass members are "consumers" within the meaning of FLA. STAT. § 501.203(7).

88.    FCA engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

89.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

90.    FCA's acts and practices, described herein, are unfair in violation of Florida law because it violates Florida public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

91.    FCA acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner, in at least the following respects:

   a.    promoted and sold or leased Class Vehicles it knew were defective;

   b.    failed to disclose the Oil Consumption Defect, and represented through advertising that the Class Vehicles possess particular qualities that were inconsistent with FCA's actual knowledge of them;

   c.    failed to make repairs or made repairs and provided replacements that caused Plaintiff and the Florida Subclass members to experience repeated instances of failure, rendering

the New Vehicle Limited Warranty useless; and

d.   minimized the scope and severity of the problems with the

Class Vehicles, refusing to acknowledge that they are defective,

and failing to provide adequate relief to consumers.

92.   The gravity of harm resulting from FCA's unfair conduct outweighs any

potential utility. The practice of selling and leasing defective Class Vehicles without

providing an adequate remedy to cure the defect harms the public at large and is part

of a common and uniform course of wrongful conduct.

93.   The harm from FCA's conduct was not reasonably avoidable by

consumers. Even after receiving a large volume of consumer complaints, FCA did

not disclose the Defect. Plaintiff Romanchuk and Florida Subclass members did not

know of, and had no reasonable means of discovering, that Class Vehicles are

defective.

94.   FCA also engaged in deceptive trade practices in violation of Florida

law, by promoting the safety, convenience, and operability of Class Vehicles while

willfully failing to disclose and actively concealing their defective nature.

95.   FCA committed deceptive acts and practices with the intent that

consumers, such as Plaintiff Romanchuk and Florida Subclass members, would rely

upon FCA's representations and omissions when deciding whether to purchase or

lease a Class Vehicle.

96. Plaintiff Romanchuk and Florida Subclass members suffered ascertainable loss as a direct and proximate result of FCA's unfair and deceptive acts or practices. Had Plaintiff Romanchuk and the Florida Subclass members known that the Class Vehicles are equipped with engines containing the Oil Consumption Defect, they would not have purchased and leased the Class Vehicles, or would have paid significantly less for the them. Among other injuries, they overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

97. Plaintiff Romanchuk and the Florida Subclass members are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and reasonable attorneys' fees under FLA. STAT. § 501.2105(1).

98. Plaintiff Romanchuk also seeks an order enjoining FCA's unfair and deceptive acts or practices pursuant to FLA. STAT. § 501.211, and any other just and proper relief available under the FDUTPA.

## COUNT II
### Violations of the Ohio Consumer Sales Practices Act
### OHIO REV. CODE ANN. §§ 1345.01, *et seq*. ("OCSPA")
### Plaintiff Kuczkowski Individually, and Behalf of the Ohio Subclass

99. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

100. Plaintiff Kuczkowski brings this claim on behalf of the Ohio Subclass, based upon, *inter alia*, the fact that she leased her Class Vehicle in the state of Ohio.

101. FCA is a "supplier" of Class Vehicles, within the meaning of the OCSPA. *See* OHIO REV. CODE ANN. § 1345.01(C).

102. The OCSPA is broadly drafted, applying to the sale of consumer goods "to an individual for purposes that are primarily personal, family, or household [uses]." OHIO REV. CODE ANN. § 1345.01(A). FCA's conduct in this case falls within the scope of the OCPSA.

103. The OCSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." OHIO REV. CODE ANN. § 1345.02(A).

104. The OCSPA broadly prohibits unfair, deceptive, and unconscionable practices in consumer sales transactions, including the sale of services. OHIO REV. CODE ANN. § 1345.02(A).

105. The OCSPA further provides that "a consumer" has a private cause of action for violations of the statute, and expressly allows for class actions. OHIO REV. CODE ANN. § 1345.09.

106. As detailed herein, FCA's conduct was unfair, deceptive, and unconscionable.

107. FCA acted in the face of prior notice that its conduct was deceptive, unfair, or unconscionable. Material misrepresentations concerning the qualities and performance of Class Vehicles, as well as material omissions concerning the Oil

Consumption Defect, constitute a violation of the statute.

108. It is also a deceptive act or practice for purposes of the OCSPA if a supplier makes representations, claims, or assertions of fact in the absence of a reasonable basis in fact. *See* OHIO REV. CODE ANN. § 109:4-3-10(A).

109. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

110. The Ohio Attorney General has made available for public inspection prior state court decisions which have held that acts and omissions similar to those FCA detailed in this complaint, including, but not limited to, the failure to honor implied warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases including, but not limited to, the following: *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382); *State ex rel. Montgomery v. Ford Motor Co.* (OPIF #10002123); *State ex rel. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025); *Bellinger v. Hewlett-Packard Co.*, 2002 WL 533403 (Ohio. Ct. App. Apr. 10, 2002) (OPIF #10002077); *Borror v. MarineMax of Ohio*, 2007 WL 431737 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388); *State ex rel. Petro v. Craftmatic Organization, Inc.* (OPIF #10002347); *Cranford, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586); *State ex rel. Brown v. Lyons, et al.* (OPIF #10000304);

*Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427); *Khouri v. Lewis* (OPIF #10001995); *Mosley v. Performance Mitsubishi aka Automanage, Inc.* (OPIF #10001326); *Walls v. Harry Williams d/b/a Butch's Auto Sales* (OPIF #10001524); and *Brown v. Spears* (OPIF #10000403).

111.  As a direct and proximate result of FCA's violations of the OCSPA, Plaintiff Kuczkowski and members of the Ohio Subclass have been injured and suffered ascertainable loss.

112.  Plaintiff Kuczkowski and the Ohio Subclass members have suffered injuries in fact and actual damages, including but not limited to overpayment for their Class Vehicles and financial losses from the devaluation of their Class Vehicles, all resulting from FCA's conduct and practices in violation of the OCSPA.

113.  These injuries are of the type that the OCSPA was designed to prevent and are the direct and proximate result of FCA's unlawful conduct.

## COUNT III
### Violations of the Wisconsin Deceptive Trade Practices Act
### Wis. Stat. §§ 100.18, *et seq.* ("WDPTA")
### Plaintiff Castillo Individually, and on Behalf of the Wisconsin Subclass

114.  Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

115.  Plaintiff Castillo brings this claim on behalf of herself and the Wisconsin Subclass.

116.  The WDPTA, §100.18(1) states, in relevant part:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, . . . shall make, publish, disseminate, circulate, or place before the public, . . . in this state, . . . an advertisement, announcement, statement or representation of any kind to the public relating to such . . . sale . . . of such real estate, merchandise, securities, service or employment . . . , which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

117.  FCA's conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, its manufacture and sale of Class Vehicles with the Oil Consumption Defect, which FCA failed to adequately investigate, disclose and remedy.  Further, FCA knew about of the defect prior to the sale of the Class Vehicles but did not disclose its existence to Plaintiff Castillo and the Wisconsin Subclass.

118. FCA supplied false information regarding the efficiency, performance, reliability, including on the window sticker, its owner's manual and maintenance guidelines, through its dealers, and its warranty terms. These statements were misleading because of the information known and omitted.

119. FCA's untrue, deceptive, and misleading assertions, representations, and statements of fact concerning the qualities, nature, and characteristics of its Class Vehicles materially induced Plaintiff Castillo and other members of the Wisconsin Subclass to pay more than they otherwise would have.

120. FCA had a duty to disclose to Plaintiff Castillo and members of the Wisconsin Subclass the Oil Consumption Defect, as the facts were material to Plaintiff Castillo and the Wisconsin Class members' transactions; because FCA made contrary representations and statements; because FCA as the party with knowledge of the defect, knew that Plaintiff Castillo and members of the Wisconsin Subclass were entering transactions under a mistake as to the fact of the defective nature of the Class Vehicles; because the fact of the defective nature was peculiarly and exclusively within FCA's knowledge and the mistaken parties, Plaintiff Castillo and Wisconsin Subclass members, could not reasonably be expected to discover it; and on account of the objective circumstances, Plaintiff Castillo and the members of the Wisconsin Subclass reasonably expected disclosure of the fact of the defect.

121.  Plaintiff Castillo and Wisconsin Subclass members have been injured as a result of FCA's conduct.  Due to FCA's deceptive or unfair conduct, Plaintiff Castillo and the Wisconsin Subclass overpaid for their Class Vehicles and did not receive the benefit of the bargain.

122.  FCA's conduct proximately caused the injuries to Plaintiff Castillo and the Wisconsin Subclass members and they are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT IV
### Breach of Express Warranty
### Plaintiffs, Individually and on Behalf of the State Subclasses

123.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

124.  Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

125.  FCA is a "merchant" as defined under the Uniform Commercial Code (UCC).

126.  The Class Vehicles are "goods" as defined under the UCC.

127.  FCA provided a New Vehicle Limited Warranty that expressly warranted FCA would repair any defects in materials or workmanship free of charge during the applicable warranty periods.

128. FCA breached its warranty by failing to provide an adequate repair when Plaintiffs and the Class Members presented their Class Vehicles to authorized FCA dealers following manifestation of the Defect.

129. The warranty formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

130. Plaintiffs and Class Members experienced the Defect within the warranty period. Despite the existence of the express warranty and multiple repair attempts, FCA failed to inform Plaintiffs and Class Members of the Defect and failed to adequately repair the Defect.

131. As a result of FCA's breach of its express warranty, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses for maintenance and service that they otherwise would not have incurred but for the Defect.

132. FCA was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to FCA and its authorized dealers, Class Members taking their vehicles to its dealers, a demand letter which was sent on March 13, 2020, and this lawsuit.

133.  Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of FCA's conduct described herein.

134.  In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to FCA's authorized dealers on numerous occasions and FCA has failed to remedy the Defect. As a result, Plaintiffs and Class Members are left with defective vehicles that pose a safety hazard and do not function as intended and, therefore, have been deprived of the benefit of their bargains.

135.  In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. FCA's warranties were adhesive and did not permit negotiations. FCA possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. FCA concealed and did not disclose this Defect, and FCA did not remedy the Defect prior to sale (or afterward).

## COUNT V
### Breach of the Implied Warranty of Merchantability
### Plaintiffs, Individually and on Behalf of the State Subclasses

136. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

137. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

138. FCA is a "merchant" as defined under the UCC.

139. The Class Vehicles are "goods" as defined under the UCC.

140. A warranty that the Class Vehicles were in merchantable quality and condition arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. FCA impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and the absence of material defects, and that the vehicles would pass without objection in the automotive trade.

141. The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition or fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles were not merchantable in that the Defect poses a significant safety hazard and can result in catastrophic engine damage. The Defect therefore renders the Class Vehicles unfit to provide safe and reliable transportation.

142. FCA was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to FCA and its authorized dealers, class members taking their vehicle to its dealers, a demand letter sent on March 13, 2020, and this lawsuit.

143. Plaintiffs and the other Class Members have had sufficient direct dealings with either FCA or its agents, including its authorized dealerships, to establish privity of contract between FCA on the one hand and Plaintiffs and each Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between FCA and its dealers, and specifically of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

144. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. FCA's warranties were adhesive and did not permit negotiations. FCA possessed superior and exclusive knowledge of the Defect, which is a latent defect, prior to offering

Class Vehicles for sale. FCA concealed and did not disclose this Defect, and FCA did not remedy the Defect prior to sale (or afterward).

145.  As a direct and proximate result of the breach of these warranties, Plaintiffs and Class Members were injured and are entitled to damages.

<u>**COUNT VI**</u>
**Violations of the Magnuson–Moss Warranty Act ("MMWA")**
**15 U.S.C. §§ 2301–2312**
**All Plaintiffs, Individually and on Behalf of the Nationwide Class**

146.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

147.  Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

148.  Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

149.  FCA is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

150.  The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

151.  15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

152.  FCA's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under the MMWA, 15 U.S.C. § 2301(7).

153.  FCA breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles contain the Defect that poses a serious safety hazard and can cause catastrophic engine damage, which renders the vehicles unfit for their intended use and unsafe.

154.  Plaintiffs and the other Class Members have had sufficient direct dealings with either FCA or its agents (e.g., dealerships) to establish privity of contract between FCA on the one hand and Plaintiffs and each Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Class Members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

155.  Plaintiffs and Class Members have afforded FCA a reasonable opportunity to cure its breach of written warranties, and any further opportunity would be unnecessary and futile here as FCA has failed to remedy the Defect.

156. At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure under the MMWA and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

157. Plaintiffs and the Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class Members have not re-accepted their Class Vehicles by retaining them.

158. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25 per claim. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

159. Plaintiffs individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT VII
## Fraudulent Concealment
## All Plaintiffs, Individually and on Behalf of the State Subclasses

160. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

161. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

162. FCA made material omissions concerning a presently existing or past fact in violation of common law. FCA did not fully and truthfully disclose to its customers the true nature of the Oil Consumption Defect. A reasonable consumer would not have expected the Defect in a new vehicle and especially not a Defect that poses a serious safety risk and can cause catastrophic engine failure.

163. FCA made these omissions with knowledge of their falsity and with the intent that Plaintiffs and Class Members rely upon them.

164. The facts concealed, suppressed, and not disclosed by FCA to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles or pay a lesser price.

165. FCA had a duty to disclose the true quality and reliability of the Class Vehicles because the knowledge of the Defect and its details were known and/or accessible only to FCA; FCA had superior knowledge and access to the relevant

facts; and FCA knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class Members. FCA also had a duty to disclose because it made many affirmative representations about the qualities and reliability of its vehicles, including references as to safety and general operability, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual reliability of their vehicles.

166. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less in doing so. Thus, Plaintiffs and the other Class Members were fraudulently induced to lease or purchase Class Vehicles, containing the Defect.

167. Plaintiffs and Class Members reasonably relied on FCA's material omissions and suffered damages as a result. FCA's conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and Class Members are entitled to an award of punitive damages.

### COUNT VIII
**Unjust Enrichment**
**In the Alternative to All Other Claims**
**All Plaintiffs, Individually and On Behalf the State Subclasses**

168. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

169.  Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

170.  This claim is pleaded in the alternative to the other claims set forth herein.

171.  As the intended and expected result of its conscious wrongdoing, FCA has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

172.  FCA has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that FCA had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle unreliable and poses a serious safety risk.

173.  FCA has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and unearned monies from Plaintiffs and the Class rightfully belonging to them.

174.  Equity and good conscience militate against permitting FCA to retain these profits and benefits from its wrongful conduct. They should accordingly be

disgorged or placed in a constructive trust so that Plaintiffs and Class Members can obtain restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, hereby request that this Court enter an Order against FCA providing for the following:

A. Certification of the proposed Class and/or Subclasses, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

B. An order permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall or free replacement/repair program;

D. Equitable relief, including in the form of buyback of the Class Vehicles;

E. Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F. An Order requiring FCA to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G. An award of reasonable attorneys' fees and costs as permitted by law; and

H. Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: May 19, 2020                     Respectfully submitted,

                              By:    /s/ *Kenneth R. Chadwell*
                                     **Mantese Honigman, PC**
                                     Douglas L. Toering (P34329)
                                     Kenneth R. Chadwell (P39121)
                                     1361 E. Big Beaver Rd.
                                     Troy, MI 48083
                                     Phone:  248-457-9200
                                     dtoering@manteselaw.com
                                     kchadwell@manteselaw.com

                                     **CHIMICLES SCHWARTZ KRINER**
                                     **  & DONALDSON SMITH LLP**
                                     Timothy N. Mathews
                                     Alex M. Kashurba
                                     361 W. Lancaster Avenue
                                     Haverford, Pennsylvania 19041
                                     Tel: (610) 642-8500
                                     tnm@chimicles.com
                                     amk@chimicles.com

                                     **CAPSTONE LAW APC**
                                     Steven R. Weinmann
                                     Tarek H. Zohdy
                                     Cody R. Padgett
                                     Trisha K. Monesi
                                     1875 Century Park East, Suite 1000
                                     Los Angeles, CA 90067
                                     Tel: (310) 556-4811

**BERGER MONTAGUE PC**
Russell D. Paul
Jeffrey L. Osterwise
Amey J. Park
Abigail J. Gertner
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
josterwise@bm.net
apark@bm.net
agertner@bm.net

*Counsel for Plaintiffs and the Proposed Putative Class Members*

65